UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AECON BUILDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH NORTH AMERICA, et al.,<br><br>Defendants. | Case No. C07-832MJP<br><br>ORDER GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY RE: BAD FAITH AND CPA VIOLATIONS |

This matter comes before the Court on Plaintiff Aecon's motions for summary judgment against Defendants Hartford and Zurich for bad faith and violations of the Washington Consumer Protection Act. (Dkt. Nos. 130 & 131.) Defendants oppose the motions. (Dkt. Nos. 160 & 162.) Having considered Plaintiff's motions, Defendants' responses, Plaintiff's replies (Dkt. Nos. 176 & 177), all documents submitted in support thereof and the balance of the record, the Court GRANTS Plaintiff's motions for summary judgment.

**Background**

**I.    The Quinault Settlement and Ensuing Litigation**

This insurance coverage action arises from claims made by the Quinault Indian Nation ("the Quinault") against Aecon Buildings, Inc. ("Aecon") regarding the construction of a casino and hotel project in Ocean Shores, Washington. Aecon was the general contractor for the project. Chinook Builders, Inc. ("Chinook") and Western Partitions, Inc. ("Western Partitions") were two of the subcontractors Aecon hired to work on the project. Construction commenced in May 1998 and was substantially completed on June 9, 2000. (Dkt. No. 134, Blood Decl., Ex. 1 at ZC 000665.) In April 2004, the Quinault contacted Aecon alleging defects in the building

ORDER — 1

structure that is part of the Quinault project. Under the contract between Aecon and the Quinault, disputes between the parties were to be resolved through good faith mediation, if possible. If mediation failed, the parties agreed to binding AAA arbitration. (See Dkt. No. 105-2 at 73-74.) During the informal dispute resolution process, it became apparent that Aecon might be held responsible for defects in the work performed by a number of its subcontractors, who were not parties to the contract between Aecon and the Quinault or to the mandatory arbitration proceeding required under it. (First Amend. Compl. at 5.) In May 2005, Aecon sued the subcontractors in King County District Court. See Aecon v. Vandermolen Const., Cause No. 05-2-03044-5 SEA.[1] Aecon partially settled the Quinault's claims in early June 2006 for approximately $1.9 million and fully and finally resolved the dispute on January 31, 2007, for $3.75 million after a final mediation proceeding. (Dkt. No. 105-10, 105-14.) In May 2006, Aecon also tendered the Quinault's claims to the subcontractors and their insurers — Hartford and Zurich — who had added Aecon as "Additional Insureds" under their policies.[2] Hartford and Zurich both refused to defend or cover Aecon. Aecon initiated this suit against Hartford and Zurich in April 2007, claiming that Defendants breached their duty to defend and indemnify Aecon, breached their duty to act in good faith, and acted negligently. (Dkt. No. 3, Compl. at 25-26.) Aecon seeks declaratory relief and damages. (Dkt. No. 24, First Am. Compl. at 8-9.)

**II.     Tender to Subcontractors**

Both of the subcontractors at issue in this litigation — Chinook (insured by Hartford) and Western Partitions (insured by Zurich) — entered into subcontract agreements with Aecon in which they agreed to defend and indemnify Aecon for claims arising out of their work and in

---

[1] Aecon did not initially sue Chinook Builders, but amended its complaint on June 7, 2006, to include claims against them. (Dkt. No. 92, Ex. 6.)

[2] The Court refers to Zurich North America, Zurich American Insurance Company, Northern Insurance Company of New York, and Valiant Insurance Company collectively as "Zurich." The Court refers to Hartford Casualty Insurance Company (referred to by Plaintiff as Hartford Insurance Group) as "Hartford."

ORDER — 2

which they agreed to list Aecon as an "Additional Insured" under their respective liability policies. (See Dkt. No. 110-5, Blood Decl., Ex. 1 at AEC 081767, 081769; Dkt. No. 105-4 at AEC 9229, 9231.)

### A. Western Partitions / Zurich

On May 3, 2006, Aecon's attorney Linda Chu tendered the Quinault's claims against Aecon to Western Partitions and its insurer, Zurich, through a broker. (Dkt. No. 105-5.) On May 12, Aecon's tender was assigned to and received by Zurich claims handler Caryn Kreman. (Dkt. No. 134, Blood Decl., Ex. 1 at ZC 000003.) On June 28, Ms. Kreman sent a letter to Aecon denying its tender of claims and indicating that she had not received any additional information from Aecon, including the underlying subcontractor agreement. (Id. at ZC 00020-23.) Between receipt of the tender on May 3 and denial on June 28, Ms. Kreman performed the following activities related to Aecon's claim:

- May 12 — Reviewed insurance policy; called Linda Chu and left a message requesting additional information. (Id. at ZC 000003; id., Ex. 2 at 87, 90-92.)
- May 15 — Sent Ms. Chu a letter acknowledging tender and seeking additional information regarding a description of the work performed and the date of completion, a copy of the job file, and a copy of the Quinault's claims; left voice mail with insurance broker seeking material Ms. Chu had enclosed with May 3 tender letter, but which Ms. Kreman had not received. (Id., Ex. 1 at ZC 000038; Ex. 2 at 87, 93-98.)
- May 15 – June 28 — Draft letter denying tender (Id., Ex. 2 at 109-10, 115.)

On June 5, Ms. Chu sent additional information to Ms. Kreman, including the subcontractor files, the certificate of project completion, the Quinault's expert's reports documenting the damage to the project, and the Quinault's counsel's letters regarding future economic damages and legal fees. (Id., Ex. 1 at ZC 000213.) Ms. Kreman's claims notes do not reflect that she personally received those documents and she testified in her deposition that she probably did not receive them because she would have documented their receipt. (See id., Ex. 2 at 152-53). But Zurich's records reflect that those documents were received by Zurich on June 8, 2006. (Id., Ex. 1 at ZC 000212.)

ORDER — 3

Regardless, Ms. Kreman testified in deposition that she did not need any additional information (and specifically did not need to investigate when any damage occurred) because it was clear to her from the claim itself that the claim was for "completed operations" and that therefore the policy did not cover Aecon as an additional insured because the subcontractor's work had been completed and the project had been turned over to the Quinault before the damage occurred. (Id., Ex. 2 at 163-87, 213.) Ms. Kreman apparently believed that because the claim was assigned to her, and that neither she nor her "unit" handled ongoing operations claims, the damage to the project must have taken place after Western Partitions left the project. (Id. at 172, 251.) Aside from reading about it in Ms. Kreman's deposition, Zurich's 30(b)(6) deponent was not familiar with any such "unit." (See id., Ex. 4, at 115-16.) Ms. Kreman admitted in her deposition that she believed she did not need to investigate any facts to make her determination. (Id. at 172, 180-81, 186-87, 213.) She testified that she believed that the "claim that was presented to [Zurich]" contained information documenting that water intrusion occurred only after Western Partitions left the job site, but she could not identify any document in the claim file that supported her belief. (Id. at 215-16.) She admitted that she did no investigation regarding the water intrusion and did no investigation regarding whether the Quinault alleged claims that Western Partitions did deficient work that led to water intrusion before the project was completed. (Id. at 186-87.) Based only on her work on the claims file, and her supervisor's review of her denial letter, Zurich denied Aecon's tender.

About a year after Ms. Kreman denied Aecon's tender, another claims adjuster, Loralee Thatcher, reexamined the claim and determined that Aecon was potentially covered as an additional insured. (Dkt. No. 105-20 at 52, 57-58.) She explained that her determination meant that if Western Partitions was covered, Aecon was also covered. (Id. at 58.) Zurich never advised Aecon of this reexamination.

**B.     Chinook / Hartford**

Also on May 3, 2006, Aecon's attorney Linda Chu tendered the Quinault's claims against

ORDER — 4

Aecon to Chinook and its insurer, Hartford, through a broker. (Dkt. No. 135, Blood Decl., Ex. 1 at HART 0171-72.) On May 9, Aecon's tender was assigned to and received by Hartford claims handler Pete Harris. (Id. at HART 340.) Six months later, Mr. Harris sent Aecon a letter denying the tender for two reasons: (1) Chinook finished its work after the policy expired and therefore the claim was barred under the "products completed operations hazard," and (2) because the units were not turned over to the Quinault during the policy period, the Quinault could not allege claims for damage during the policy period. (Id. at HART 0113-15 & Ex. 3 at 69-70.) Between the time that he received the claim and denied it, it appears from the record that Mr. Harris asked Ms. Chu for more materials (which she provided), he asked the insurance broker for more information, he reviewed the documents in his possession (the insurance policy, the subcontract, and the expert reports), and he hired an independent adjuster to find out the date of the Quinault's Certificate of Occupancy. (Id. at HART 338-340; id., Ex. 2 at 65-66, 75, 80, 82, 93-94; id., Ex. 3 at 18, 21, 34.) Aecon's tender was denied based solely on Mr. Harris' analysis and a review of the denial by his supervisors. (See id., Ex. 5 at 61-62.)

In terms of the reasons he gave for the denial, first, Mr. Harris believed that coverage under the policy required all of Chinook's work to have been completed on the project during the policy period. (Id., Ex. 3 at 52.) He based this on the "projects completed operations hazard" in the policy.[3] He knew that the Certificate of Occupancy was dated October 14, 2000, and in a

---

[3] "Products completed operations hazard" is defined in the policy as follows:

[A]ll bodily injury and property damage occurring away from premises you own or rent and arising out of your product or your work except:

(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned.
    a. Your work will be deemed completed at the earliest of the following times:
        1. When all the work called for in your contract has been completed.

(Dkt. No. 135, Blood Decl., Ex. 1 at HART 0114-15.) Neither Mr. Harris nor Hartford ever explains the relevance of that definition; they never point to a provision that makes use of the "products

ORDER — 5

June 9, 2006 notation in his claim notes he wrote "completed in 6/2000." (Id., Ex. 1 at HART 0339.) In his deposition, Mr. Harris could not identify where he obtained that June 2000 date; he also could not identify any documents in the claims file that supported that date nor could he say conclusively whether that date referred to <u>Aecon</u> or <u>Chinook</u>'s completion of the project. (See id., Ex. 3 at 56, 123-24.) Other documents in the claim file actually suggest that Chinook could have completed its work during the policy period: the subcontractor agreement provides that Chinook would finish its work so that the project could be substantially complete by April 13, 2000. (Dkt. No. 110-5 at 44.) Aside from asking Ms. Chu to send pleadings in the underlying cases, Mr. Harris admitted in his deposition that he did no investigation to determine when property damage attributable to Chinook first occurred. (Dkt. No. 135, Blood Decl., Ex. 3 at 77-78, 88-89.)

Second, Mr. Harris believed that Aecon was not covered because it was his understanding that the Quinault could not sue for damages that occurred to the property during a period prior to when they actually owned the property. (Id. at 85-86.) In responding to questions about where he thought the policy included that requirement, he pointed to the following underlined language in the policy:

> b. This insurance applies to "bodily injury" or "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
> (2) <u>The "bodily injury" or "property damage" occurs during the policy period</u>.

(Id. at 86; Id., Ex. 1 at HART 0117.) Mr. Harris further explained:

> So Quinault did not own the property until November of 2000, at the earliest. My policy expired April of 2000. The policy says you must have property damage during the policy period. The policy period expired 4/17 of 2000. So Quinault brings a lawsuit for damage that – for damage to property that they now own after or on 11 of 2000. They're not bringing damage to property that they don't own, because they don't own it, and they would have no standing to sue for property that they don't own.

---

completed operations hazard" definition as it would be applied in this case.

ORDER — 6

(Id., Ex. 3 at 70-71.) Importantly, Mr. Harris never explained in his denial letter or in his deposition how he arrived at the conclusion that, contrary to the tender letter's description of the Quinault as the owner during the policy period (Id., Ex. 1 at HART 0171), the Quinault did not own the property during construction and the Hartford policy period.

Hartford later determined that it had a duty to defend Chinook under the same policy. (Id., Ex. 7 at ¶ 6.) Hartford defended Chinook after Aecon obtained a default judgment against Chinook in state court.

## III. Aecon's Motions

Based on the above facts, Aecon now moves against both Defendants for summary judgment on its bad faith and CPA claims. The thrust of Aecon's argument is that neither Defendant performed an adequate investigation prior to denying the tender. Both Defendants oppose the motions, and Zurich cross-moves for summary judgment on these issues.

## Discussion

## I. Summary Judgment Standard

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where, as here, the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. Catrett, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order

to defeat the motion. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

Bad faith claims generally raise fact issues preventing a determination on summary judgment. See Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484 (2003). But if reasonable minds could not differ on whether the defendant acted in bad faith or violated the CPA, summary judgment is appropriate. See id.; see also Bryant v. Country Life Ins. Co., 414 F. Supp. 2d 981, 1000 (W.D. Wash. 2006); Sharbono v. Universal Underwriters Ins. Co., 139 Wn. App. 383, 414 (2007).

**II.  Bad Faith**

Bad faith handling of an insurance claim is a tort analyzed applying the same principles as other torts: duty, breach of that duty, proximate cause, and damages. Smith, 150 Wn.2d at 485. Insurers have a duty to act in good faith separate from their contractual coverage obligations to their insureds. See Safeco Ins. Co. v. Butler, 118 Wn.2d 383, 393 (1992) (recognizing that insurer has an "enhanced obligation of fairness toward its insured" that "imposes a duty beyond that of the standard contractual duty of good faith"); Tank v. State Farm Fire & Casualty Co., 105 Wn.2d 381, 385-86 (1986) (holding that the fiduciary relationship underlying the insurer's duty of good faith imposes a responsibility to give equal consideration to an insured's interests). In the third-party context, harm is presumed where an insurer acts in bad faith. Mutual of Enumclaw Ins. Co. v. Dan Paulson Const., Inc., 161 Wn.2d 903, 920 (2007). In order to prove that the insurer acted in bad faith, the insured must show the breach was "unreasonable, frivolous, or unfounded." Smith, 150 Wn.2d at 484.

If an insured prevails on a bad faith claim, the insurer is estopped from denying coverage. Dan Paulson, 161 Wn.2d at 920. This is true even where coverage never in fact existed. In Coventry Associates v. American States Insurance Co., the Washington Supreme Court rejected the proposed "no harm no foul" rule and held as follows:

> We hold an insured may maintain an action against its insurer for bad faith investigation of the insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist. An insurer's duty of good faith is separate from its duty to indemnify if coverage exists. This

ORDER — 8

> result creates no insurmountable burden on the insurer. The insurer is required only to fulfill its contractual and statutory obligation to fully and fairly investigate the claim. The problem arises when the insurer fails to investigate, in bad faith, thereby placing the insured in the difficult position of having to perform its insurer's statutory and contractual obligations.
>
> Although [the defendant insurer's] all or nothing approach is appealing, it does not recognize the jurisprudence this court has established regarding the tortious nature of a bad faith claim nor does it recognize that insurers have a general duty of good faith in their actions with their insureds . . . .
>
> Under [the defendant insurer's] proposed rule, insurers would have a duty of good faith toward their insureds only when coverage was required. That reasoning begs the question and runs counter to our previous holdings.

136 Wn.2d 269, 279-80 (1998); see also Bryant, 414 F. Supp. 2d at 997 ("[Plaintiff] may assert a claim for bad faith claims handling even if it is ultimately determined that there is no insurance coverage.").

Defendant attempts to side-step this rule, arguing in response to this motion and in other motions regarding the duty to defend and the lack of an "occurrence" under the policy that there could be no breach of the duty of good faith if no duty to indemnify or defend existed under the policies. This unsupported argument ignores both Washington case law differentiating insurers' fiduciary obligation to act in good faith to their insureds and their contractual duties under the policies and the Washington Supreme Court's clear pronouncement in Coventry. Hartford cites the Washington Court of Appeals' decision in Holly Mountain Resources, Ltd. v. Westport Insurance Corp. for the proposition that where no duty to defend exists, the insurer cannot act in bad faith. The Washington Court of Appeals did say in Holly Mountain that "because [the insurer] had no duty to defend, as a matter of law, it did not act in bad faith in denying Holly Mountain's tender of its defense." 130 Wn. App. 635, 652 (2005). But in that case, the insurer's denial of coverage and a defense were based upon a "reasonable interpretation of the insurance policy." Id. at 650. Although the court also considered whether the insurer conducted its investigation in good faith and concluded that it did, see id., the court's conclusion regarding the bad faith issue focused on the reasonable coverage determination. Holly Mountain is easily

ORDER — 9

distinguishable from the case at hand where the bad faith allegations arise from a failure to investigate rather than an unreasonable coverage determination. Rayborn v. State Farm Fire & Casualty Co., cited by Defendant is likewise unhelpful in that it did not involve a bad faith claim based on a failure to reasonably investigate the tendered claim. See No.CV-05-05479RBL, 2006 U.S. Dist. LEXIS 4351 (W.D. Wash. Jan. 20, 2006). The Court concludes that, under the Washington Supreme Court's decision in Coventry, Plaintiff may maintain its bad faith claims regardless of whether any duty to defend or indemnify actually existed under the policies.

The duty to act in good faith includes the duty to reasonably investigate a claim. As explained by the Washington Supreme Court in Coventry

> [A]n insurer is [not] required to pay claims which are not covered by the contract or take other actions inconsistent with the contract. Of course, insurance companies, like every other organization, are going to make some mistakes. As long as the insurance company acts with honesty, bases its decision on adequate information, and does not overemphasize its own interests, an insured is not entitled to base a bad faith or CPA claim against its insurer on the basis of a good faith mistake. . . . We agree with one commentator who states:
>
>> The implied covenant of good faith and fair dealing in the policy should necessarily require the insurer to <u>conduct any necessary investigation in a timely fashion and to conduct a reasonable investigation before denying coverage</u>. In the event the insurer fails in either regard, it will have breached the covenant and, therefore, the policy.
>
> 1 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 2.05, at 38 (3d ed. 1995).

136 Wn.2d at 280-81 (emphasis added). Moreover, "[a]n insurer may not fail to conduct a reasonable investigation simply because it appears initially that the loss is not covered." Fireman's Fund Ins. Co. v. Alaskan Pride Pshp., 106 F.3d 1465, 1470 (9th Cir. 1997). "An insurer does not have a reasonable basis for denying coverage and, therefore, acts without reasonable justification when it denies coverage based upon suspicion and conjecture." Indus. Indem. Co. v. Kallevig, 114 Wn.2d 907, 917 (1990) (holding that "an insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit").

ORDER — 10

As explained in Bryant, where "reasonable minds could not differ as to a finding that [the adjuster's] incuriousness and her failure to inquire further" into the claim constitutes a failure to conduct a reasonable investigation of the claim, summary judgment is warranted. Bryant, 414 F. Supp. 2d at 1000 (granting summary judgment where insurer did not dispute that it made its coverage decision based on assumptions and misinformation regarding facts surrounding policyholder's death).

The question here is whether either of the insurer defendants reasonably investigated Aecon's tender. The Court concludes that both insurers' investigations were so unreasonably defective that reasonable minds could not differ that they constitute bad faith.

### A. Zurich's unreasonable investigation

The documents provided to the Court indicate that Ms. Kreman conducted no investigation at all into whether Aecon was covered as an additional insured under Western Partitions' policy. Defendant's attempts to create an issue of material fact are unavailing. First, Defendant attempts to shift the burden — arguing that Aecon or Ms. Chu should have provided more material to Zurich before or after Zurich issued its denial letter. But it is an insurer's affirmative duty to investigate a claim before it denies coverage, see Coventry, 136 Wn.2d at 280-81, not the insured's duty to continue supplementing the record to an uninquisitive insurer. Second, Zurich argues that evidence in the record — particularly, the Quinault's expert report and attorney Michael Grace's testimony — indicates that Ms. Kreman was correct in her conclusion that the Quinault's claims arose after operations were completed. But Michael Grace's testimony was not available at the time of the denial decision. The question is whether there is an issue of fact regarding whether denial of coverage was unreasonable when it occurred, not whether later developments could have vindicated Zurich's decision. See Alaska Pride, 106 F.3d at 1470. In terms of the expert report, Zurich fails to point to any part of the report documenting when damage occurred. Zurich does point to various pages of the report that discuss repairing conditions after the project was completed. But those references do not

foreclose the need to investigate the date that property damage first occurred. Moreover, during her deposition, Ms. Kreman could not identify any place in the report that supported her belief that no damage occurred before the project was completed. (Dkt. No. 134, Blood Decl., Ex. 2 at 190, 216, 262-66.) The expert report therefore does not create an issue of fact on the issue of whether Ms. Kreman conducted a reasonable evaluation.

Third, Defendant argues that a good faith mistake occurred when the documents Ms. Chu sent in response to Ms. Kreman's request were lost. The loss was arguably a good faith mistake; Ms. Kreman's failure to follow up regarding the missing documents and inquire as to their whereabouts was not. Fourth, Zurich offers the report and deposition testimony of its expert, who concluded that Zurich's claims handling was reasonable. (See Dkt. No. 163, Exs. E & F.) But the expert did not specifically discuss in his report or his testimony whether Ms. Kreman's <u>investigation</u> was reasonable. Moreover, the expert report must be stricken because it is unsworn hearsay. See <u>Shuffle Master, Inc. v. MP Games LLC</u>, 553 F. Supp. 2d 1202 at *5 (D. Nev. 2008).[4] Because they are not on point, and because the report is stricken, the expert's report and deposition testimony do not raise an issue of material fact on this point.

In the end, it is clear that Ms. Kreman conducted no investigation at all because she assumed without adequate factual basis that the claim was a "completed operations" claim. Her failure to conduct any investigation at all constitutes bad faith.

Plaintiff also argues that Zurich acted in bad faith by failing to advise Aecon that another adjuster, Loralee Thatcher, later determined that there was potential coverage for Aecon as an additional insured and by failing to produce portions of the claims file on Aecon's tender. The Court need not reach this issue given its conclusion regarding Ms. Kreman's bad faith investigation.

---

[4] The Court also has not considered the deposition testimony of Plaintiff's experts. Defendant's motion to strike those depositions is therefore moot.

ORDER — 12

### B. Hartford's unreasonable investigation

Like Zurich, Hartford fails to raise any material facts on the issue of whether Mr. Harris' investigation was reasonable. First, Mr. Harris assumed without doing any investigation that Chinook's work was completed after the policy ended. Not only was he unable to identify any document in the claims file that supported that assumption, neither Mr. Harris nor Hartford has articulated why Mr. Harris thought that the policy would not provide coverage if his factual assumption was correct. Second, Mr. Harris assumed without doing any investigation that the Quinault did not "own" the property until after Hartford's policy expired, even though that assumption was contrary to information in Aecon's tender letter. Again, neither he nor Hartford has been able to articulate any logical reason why that fact — even if true — would preclude coverage here. Because he speculated without conducting a reasonable investigation, and because that speculation resulted in a denial without a basis in the policy or in fact, Mr. Harris' handling of claim constitutes bad faith.

Hartford's efforts to divert the Court's attention from Mr. Harris' bad faith handling of the claim highlights its inability to offer up any facts that raise an issue about whether Mr. Harris conducted a reasonable investigation. Hartford complains that Aecon waited too long to tender its claim, that Aecon originally only sent a tender letter and the two expert reports, and that no one informed Hartford about the Quinault settlement or the King County action against Chinook. These complaints and justifications are immaterial to the question of whether Mr. Harris conducted a poor investigation. Defendant also points out that Mr. Harris hired an independent adjuster to help with investigation. But that independent adjuster was only investigating the date of the Certificate of Occupancy, not the date that Chinook completed its work. Defendant finally argues that the denial was reasonable based on Mr. Harris' understanding of the policy language. But whether denial was reasonable is not dispositive of whether there was a bad faith investigation. The Court concludes that Hartford has failed to raise an issue of fact regarding whether Mr. Harris conducted a good faith investigation.

### C. Estoppel Remedy

In the third-party context, where an insurer acts in bad faith, harm is presumed. If that harm goes unrebutted, the insurer is estopped from denying coverage. See Dan Paulson, 161 Wn.2d at 920. Here, Defendants acted in bad faith by failing to reasonably investigate Plaintiff's claims and have offered no evidence suggesting that Plaintiff was not harmed by their bad faith conduct. Summary judgment on Plaintiff's bad faith claims against Hartford and Zurich is GRANTED and Defendants are estopped from denying coverage.

## III. CPA Violations

A CPA claim requires a showing of (1) an unfair or deceptive practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act. Anderson v. State Farm Mut. Ins. Co., 101 Wn. App. 323, 330 (2000). In terms of the first element, an insurer's bad faith conduct or its violation of any subsection of WAC 284-30-330 constitutes a per se unfair trade practice. Bryant, 414 F. Supp. 2d at 1002; Kallevig, 114 Wn.2d at 922. The second prong is satisfied where an action involves insurance contracts. See Bryant, 414 F. Supp. 2d at 1003. Third, CPA claims alleging unfair insurance claims practices always meet the public interest element because RCW 48.01.030 declares that the "business of insurance is one affected by the public interest." Id. Finally, a claimant must present some evidence showing injury to its business or property caused by the violation. See Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wn. App. 553, 563 (1992) ("There must be some evidence, however slight, to show injury to the claimants' business or property."). Here, Aecon was injured when it was left without Defendants' help in defending against the Quinault's claims and paying the costs of the settlement. Thus, the only question is whether Zurich's conduct violated any of the applicable regulations.

### A. Zurich's CPA Violations

Aecon alleges that Zurich violated four subsections of WAC 284-30-330:

ORDER — 14

> (3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.
>
> (4) Refusing to pay claims without conducting a reasonable investigation.
>
> (5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.
>
> ***
>
> (13) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Zurich has raised issues of material fact regarding the third, fifth, and thirteenth subsections: Zurich employs a "Best Practices" manual applicable to construction defect claims, Ms. Kreman's denial was timely and Ms. Thatcher did not "affirm" coverage, and Ms. Kreman provided a detailed explanation of the basis of her denial. However, Defendant failed to raise any issues of material fact regarding the fourth subsection — refusing to pay without conducting a reasonable investigation. Zurich violated the CPA when it failed to conduct a reasonable investigation before denying Aecon's tender. Summary judgment on this claim is GRANTED.

**B.  Hartford's CPA Violations**

Aecon also alleges that Hartford violated subsections (1), (3), (4), and (13) of WAC 284-30-330. Subsection (1) makes unlawful "[m]isrepresenting pertinent facts or insurance policy provisions." WAC 284-30-330(1). Issues of material fact preclude summary judgment on all but the fourth subsection. Mr. Harris testified that Hartford has claims handling handbooks and that he has participated in training seminars and keeps and uses his materials from those seminars, (Dkt. No. 135, Blood Decl., Ex. 2 at 43-52), and there are issue of fact regarding whether his explanation was "reasonable" and whether he "misrepresented" the facts and policy or just made poor assumptions regarding the facts of the claim and the policy provisions. However, Defendant failed to raise any issues of material fact regarding the fourth subsection — refusing to pay without conducting a reasonable violation. Hartford violated the CPA when it failed to

ORDER — 15

conduct a reasonable investigation before denying Aecon's tender. Summary judgment on this claim is GRANTED.

## IV. Unclean Hands

Zurich argues that, even if there was bad faith, estoppel would be an inappropriate remedy because Plaintiff has "unclean hands." Zurich first argues that Aecon has unclean hands because it did not send more information to Ms. Kreman after Ms. Kreman issued her denial letter, which indicated that she did not have a copy of the subcontract agreement. But Aecon had already sent those materials to Zurich — Zurich and/or Ms. Kreman apparently lost them. This does not justify an unclean hands defense. Second, Defendant argues that Aecon acted inequitably by not disclosing applicable builders risk policies and by falsely suggesting in their discovery responses that no other policies were "relevant" in this case. Aecon argues that these policies have been available throughout these proceedings, (and were only not identified in the initial disclosures) and that therefore there was no bad faith.

Regardless, Zurich does not show that any inequitable conduct relates to the subject matter of the claims against it. See Dollar System, Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir. 1989). In Dollar Systems, the court explained that "[i]t is fundamental to [the] operation of the [unclean hands] doctrine that the alleged misconduct by the plaintiff relate directly to the transaction concerning which the complaint is made." Id.[5] In that case, the court concluded that the plaintiff's alleged misconduct — failure to perform under a franchise agreement — was unrelated to the issue of whether the plaintiff was entitled to rescind the franchise agreement. Because the alleged misconduct occurred after the execution of the franchise agreement, the unclean hands defense was not available. Id. The same is true here — any misconduct on Aecon's part occurred long after the insurers denied tender without reasonably investigating the claims. Because any inequitable conduct does not relate to the poor

---

[5] The Court acknowledges that the court in Dollar Systems was applying California law, but finds no reason to believe that Washington courts would differ on the issue.

ORDER — 16

investigation, Zurich cannot pursue an unclean hands defense.[6]

**Conclusion**

Summary judgment is rarely granted on bad faith claims because whether an insurer handled a claim reasonably is a question of fact. But here, because Defendants fail to raise any issues of material fact regarding whether they conducted reasonable investigations before denying Aecon's claims, summary judgment on Plaintiff's bad faith claims is warranted. For the same reason, the Court grants summary judgment on Plaintiff's claims that Zurich and Hartford violated the CPA when they failed to conduct a reasonable investigation before denying coverage. Estoppel is the appropriate remedy: because they acted in bad faith, Defendants may not deny coverage. For the same reasons, Zurich's cross-motion is denied.

The parties have several other dispositive motions pending before the Court, many of which touch on coverage issues. The parties are directed to meet and confer within three (3) calendar days of this order and provide the Court with a joint status report detailing which issues remain to be decided on summary judgment and which motions are now moot. For reference, the Court believes the following motions are now moot: Defendants' motions regarding the duty to defend (Dkt. Nos. 81 & 91), Defendants' motions regarding lack of "occurrence" (Dkt. Nos. 128 & 151), and Zurich's motion regarding policies incepting after March 2001 (Dkt. No. 145).

The clerk is directed to send copies of this order to all counsel of record.

Dated: August 4, 2008.

*[signature]*

Marsha J. Pechman
United States District Judge

---

[6] The Court need not consider Aecon's alternative argument, i.e. that Defendants cannot raise "unclean hands" now because they never pled it. The Court also need not consider Hartford's unsupported suggestion that Aecon somehow inhibited its ability to conduct a reasonable investigation. Hartford does not actually argue that Aecon has "unclean hands" and, regardless, has not factually supported any such assertion.

ORDER — 17